IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:22-CR-68-TAV-JEM |
| | ) | |
| YAZAN ARAFAT ABDUL-LATIF, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions are referred to the undersigned for disposition or recommendation as appropriate. *See* 28 U.S.C. § 636(b). This case is before the undersigned on Defendant Yazan Abdul-Latif's motion to suppress evidence, arguing that law enforcement seized items outside the scope of the search warrant for his residence [Doc. 129].

Defendant is charged, along with sixteen named codefendants, with conspiring to distribute one thousand kilograms or more of marijuana from January 2019 through June 23, 2022 (Count One) [Doc. 146 pp. 1–2]. He is also charged with possession of a firearm in furtherance of drug trafficking on March 17, 2022 (Count Three), and with conspiring to commit money laundering from January 2019 to June 23, 2022 (Count Four) [*Id*. at 2–4].

On March 17, 2022, law enforcement executed a search warrant at Defendant's residence, 380 Leslie Lane, Weaverville, California ("the residence"), and seized controlled substances, firearms, ammunition, over $325,500 in currency, numerous records and documents, money counting and wrapping supplies, electronic devices including six cellular telephones, jewelry, a watch, sunglasses, eight purses, three backpacks, three pieces of luggage, and two vehicles. Defendant challenges the execution of the search warrant, arguing the officers unlawfully seized the jewelry, the watch, sunglasses, purses, backpacks, luggage, and the vehicles in violation of his

Fourth Amendment rights because these items were outside the scope of the search warrant. Defendant asks the Court to suppress all items seized from his residence during the execution of the search warrant because law enforcement acted in flagrant disregard for the terms of the warrant. He also calls for the return of all improperly seized property to him.

After reviewing the evidence, the arguments of the parties, and the relevant law, the undersigned recommends that the District Judge grant Defendant's motion in part and deny in part. The undersigned finds that thirteen items were seized outside the scope of the search warrant and that the good-faith exception does not save the thirteen items from exclusion as evidence at trial. But because the thirteen items are charged in the forfeiture allegations in the Superseding Indictment, they should not be returned to Defendant at this time.

## I. BACKGROUND

On November 8, 2022, Defendant filed a Motion to Suppress Evidence and Return Items Seized Outside the Scope of Search Warrant [Doc. 129], attaching the search warrant for his residence and the receipt listing property seized [Doc. 129-1].[1] The Government responded in opposition on March 24, 2023, arguing that Defendant's motion is moot because the Government does not intend to introduce the nineteen items challenged by Defendant as evidence at trial [Doc. 183 pp. 3–4]. Defendant filed a reply,[2] arguing that he is entitled to the return of the items

---

[1]     In addition to arguing for the suppression of nineteen listed items and their return to him, Defendant stated that he might later challenge the sufficiency of the search warrant and argue for the suppression of all items seized pursuant to the search warrant based upon the executing officers' flagrant disregard for the terms of the warrant [Doc. 129 p. 3]. Declining to litigate issues related to the search of Defendant's residence piecemeal, the undersigned ordered Defendant to file a supporting brief or another motion containing all issues Defendant seeks to raise regarding the search of his residence pursuant to the search warrant [Doc. 133 p. 2]. Defendant failed to file a supplemental brief or other pretrial motion by the deadline imposed by the Court [*See* Doc. 253 p. 1 & n.1].

[2]     Defendant's reply was filed on May 12, 2023 [Doc. 241], which was after the expiration of the May 9 deadline set by the Court [*see* Doc. 228, Minutes from April 26, 2023 Status

2

improperly seized [Doc. 241 pp. 2–3]. He also asserted that the Court should suppress all evidence seized pursuant to the warrant due to the executing officers' flagrant disregard for the scope of the warrant [*Id*. at 4–5]. The Government filed a supplemental brief, withdrawing its offer not to introduce the challenged items at trial and asserting that the items were properly seized, the executing officers acted in good faith, and the return of the items to Defendant is not a proper remedy [Doc. 252 pp. 1, 5–8].[3]

The parties appeared on June 28, 2023, for an evidentiary hearing on the suppression motion. Assistant United States Attorney Cynthia F. Davidson represented the Government. Attorney Norman Silverman represented Defendant Abdul-Latif, who was also present. The Government presented the testimony of Task Force Officer Kristopher Mynatt ("TFO Mynatt"). After receiving the evidence and hearing the arguments of the parties, the undersigned took the motion under advisement.[4]

Immediately after the hearing, Defendant moved for leave to file a supplemental brief on the application of the good-faith exception to this case [Doc. 258]. The undersigned permitted the supplemental filing and allowed the Government to respond [Doc. 259]. The Government filed a timely response [Doc. 262] after which, the undersigned again took the motion, the evidence, and all filings under advisement.

---

Conference]. Defendant asserted his late filing was due to health issues experienced by defense counsel [Doc. 241 p. 1]. The Court permitted the untimely reply [Doc. 242].

[3]     The Court permitted the Government's supplemental brief and allowed Defendant to file a reply [Doc. 253]. Defendant did not file a reply to the Government's supplemental brief.

[4]     At the conclusion of the evidentiary hearing, both parties declined the opportunity to file post-hearing briefs [Doc. 315 p. 119].

## II.    SUMMARY OF THE EVIDENCE

At the June 28, 2023 evidentiary hearing, TFO Mynatt testified that he works for the Roane County Sheriff's Office and is a task force officer with the Federal Bureau of Investigation ("FBI") serving on the drug and violent crimes squad [Doc. 315 p. 4].[5] TFO Mynatt has been in law enforcement for twenty-seven years and has served as an FBI task force officer since 2008 [*Id*.]. He has experience investigating large, multi-district drug conspiracies involving narcotic drugs including marijuana [*Id*. at 5–6]. TFO Mynatt stated that he has participated in ten or more investigations involving Title III wiretaps for the contents of communications by the members of a conspiracy [*Id*. at 7].

TFO Mynatt said he is also familiar with money laundering in relation to drug crimes [*Id*. at 7–8]. According to TFO Mynatt, drug traffickers launder their proceeds by purchasing more drugs and buying assets with the proceeds from drug sales [*Id*. at 8]. Drug traffickers also launder proceeds by providing money for other people to use in purchasing items or opening shell bank accounts or fake businesses [*Id*.]. TFO Mynatt stated the goal of money laundering is to make it appear that an item came from a legitimate source, rather than an illegal source [*Id*. at 8–9]. Typically, drug trafficking is a cash-based business because illegal activity using cash is harder to trace through banking records [*Id*. at 9]. Based upon his training, TFO Mynatt stated that placing large amounts of money in a bank account creates a "red flag," and depositing or withdrawing over $10,000 will trigger a suspicious activity report from the bank [*Id*. at 9–10].

In this case, TFO Mynatt participated in a Title III investigation of Jordan White's Snapchat account [*Id*. at 10]. He said he learned of Defendant Abdul-Latif thorough conversations, videos,

---

[5]    A transcript of the June 28, 2023 hearing was filed on September 8, 2023 [Doc. 315].

4

and pictures on Jordan White's Snapchat account [*Id*.]. TFO Mynatt said that during most of the conspiracy, Defendant was in California.

TFO Mynatt applied for and obtained a search warrant for Defendant's California residence from a United States Magistrate Judge in California [*Id*. at 10, 12, Exh. 1]. He prepared Attachment B to the search warrant, which is a list of items to be seized [Doc. 315 pp. 12–13]. He said Attachment B was modified to align with procedures and preferred language in that district [*Id*. at 12]. Specifically, Attachment B was changed to limit the amount of currency officers could seize to amounts over $1,000 [*Id*. at 13].

He agreed that Attachment B, states the "'items to be seized are evidence, contraband, fruits, or instrumentalities of violations of' Title 21, United States Code § 841, 846 and 1956, which is money laundering," and that it says, "'namely,'" before listing the items to be seized [*Id*.; Exh. 1, Attachment B, p. 1]. TFO Mynatt said he did not consider the list following the term "namely" to be exhaustive [Doc. 315 p. 13]. Instead, he considered the list to be "basic descriptions of things we're looking for, not necessarily specific items[ to be seized], because . . . it would be almost impossible to identify every possible item that could be an instrumentality or proceed from money laundering" [*Id*. at 13–14].

TFO Mynatt stated that Attachment B lists currency as an item to be seized and that the California prosecutor with whom he was working reworded that section because he said the judge would require the modification [*Id*. at 14]. During the search, he said the officers saw many "high-value, high-dollar items" [*Id*. at 14–15]. He said the officers "used that thousand dollar[ amount] as kind of a bright[-]line rule" for seizing items they believed were proceeds of the stated crimes, and they looked up the value of items before determining whether to seize them as proceeds [*Id*. at 15]. TFO Mynatt identified the search warrant return made to the California magistrate judge

[*Id.*; Exh. 2]. He agreed the return is a list of items that the executing officers believed were the "fruits, evidence, and contraband" of money laundering [Doc. 315 pp. 15–16]. He said the return contains sixty items and some of the entries were for multiple documents or items [*Id*. at 16].

TFO Mynatt testified that he participated in the search of Defendant's residence [*Id*.]. Both Defendant and his girlfriend Hailey O'Brian, who is a codefendant in this case, were present during the search [*Id*. at 16–17]. He said another individual lived in a camper on the property, but the officers did not search the camper because it was not included in the search warrant [*Id*.]. TFO Mynatt identified a collective exhibit of sixty-five photographs of items seized during the execution of the search warrant [*Id*. at 17–18; Exh. 3].[6] He said these sixty-five photographs were selected from approximately 800 photographs taken during the execution of the search warrant [Doc. 315 p. 17].

TFO Mynatt identified photographs of a room in Defendant's residence that contained bags of marijuana, packaging materials, two vacuum sealers, and a money counter [*Id*. at 22–24, 32; Exh. 3-059, 3-064, 3-065, & 3-257]. He said the marijuana was packaged in "turkey bags," which are plastic bags used for basting turkeys [Doc. 315 p. 22]. TFO Mynatt described drug trafficking as a "cash-heavy business" and stated that a money counter is useful to assist with counting large amounts of cash [*Id*. at 33]. He testified about a photograph of a closet in that room, which shows both turkey bags of marijuana and vacuum-sealed bags of marijuana [Doc. 315 p. 24; Exh. 3-066]. TFO Mynatt identified U-Haul boxes in the room that contained empty boxes for designer items

---

[6] The Government identified the individual photographs by their JPEG numbers [Doc. 315 pp. 19–20]. These photographs will be referenced herein by the exhibit number and final three digits of the JPEG number. For example, the first photograph in collective Exhibit 3 will be cited as Exh. 3-002.

[Doc. 315 p. 34; Exh. 3-264]. He stated that, to his knowledge, during the time he investigated the case, Defendant did not have a job other than distributing marijuana [Doc. 315 p. 34].

TFO Mynatt also identified a photograph of Defendant's garage depicting a safe [Doc. 315 p. 25; Exh. 3-112]. He stated that the safe contained over $300,000 [Doc. 315 pp. 25–26, 43; Exh. 3-388]. According to TFO Mynatt, a photograph of the interior of the safe shows two bags or backpacks, a paper bag, and some "loose cash" [Doc. 315 pp. 28–30; Exh. 3-239, 3-243, & 3-244]. TFO Mynatt said the paper bag inside the safe contained bundled cash [Doc. 315 p. 29; Exh. 3-242]. He stated that one of the backpacks from inside the safe contained bundles of cash some of which were vacuum sealed [Doc. 315 pp. 30–32; Exh. 3-248, 3-249, & 3-252]. He testified that in this drug trafficking organization, others sent vacuum-sealed bags of cash to Defendant through the mail [Doc. 315 p. 30]. According to TFO Mynatt, the cash was vacuum sealed to reduce odor and to make the contents of the package harder to identify by touch [*Id.*].

He further identified two photographs, also taken in the garage, of three Revelry bags containing vacuum sealed bags of marijuana [Doc. 315 pp. 25–26; Exh. 3-121 & 3-128].[7] He stated that Revelry bags are large duffle bags that are odor resistant or odor diffusing such that the odor of the contents of the bag cannot be detected outside the bag [Doc. 315 p. 25]. He said all the Revelry bags seized from the residence contained marijuana [*Id.*]. TFO Mynatt said that Revelry bags cost between $200 and $400 each, so the officers seized these bags for "their evidentiary value" [*Id.* at 25–26].

TFO Mynatt testified that a Maybach Mercedes was parked in the driveway in front of the residence [Doc. 315 p. 26; Exh. 3-002, 3-146, 3-150]. He said Defendant was the owner of this

---

[7]     TFO Mynatt identified additional photographs of the Revelry bags, which had been moved outside the garage and which showed the bags were filled with vacuum-sealed bags of marijuana [Doc. 315 pp. 46–47; Exh. 3-447 & 3-448].

vehicle, which is worth over $100,000 new, and that he was not aware of any liens on this vehicle [Doc. 315 p. 26]. When asked about the use of this vehicle in the conspiracy, TFO Mynatt stated that he saw numerous pictures and videos of Defendant and Jordan White with Defendant's Maybach Mercedes on White's Snapchat account with text added stating "get that bread" and other captions alluding to making money [*Id*. at 27]. TFO Mynatt said officers located a black leather Coach Edge 2020 backpack bag in the trunk of the Maybach, and the Coach backpack contained $6,786 [*Id*. at 45, 49; Exh. 3-412 & 3-415].[8]

TFO Mynatt also testified about a GMC Denali pickup truck parked in the driveway in front of the residence [Doc. 315 p. 27; Exh. 3-002, 3-167]. He said a GMC Denali is valued at around $90,000 when new and that he was not aware of a lien on this vehicle [Doc. 315 pp. 27–28]. He stated that officers seized $13,000 from the center console of the truck [*Id*. at 44]. TFO Mynatt identified a photograph of a Louis Vuitton backpack on the backseat of the truck [Doc. 315 p. 28; Exh. 3-183]. According to TFO Mynatt, the executing officers seized a Louis Vuitton backpack, which contained $2,200, from the backseat of the truck [Doc. 315 pp. 43–44, 48–49; Exh. 3-395 & 3-646]. He said a black trash bag on the floorboard of the truck's backseat contained ten clear "turkey" bags of marijuana [Doc. 315 pp. 28, 43, 49; Exh. 3-183 & 3-393 (depicting ten bags of marijuana removed from the trash bag)].

TFO Mynatt identified photographs of a loaded handgun found beneath the couch cushions in the living room of the residence [Doc. 315 p. 35; Exh. 3-300 & 3-308]. He also identified a photograph of a Louis Vuitton purse located in the kitchen bar area [Doc. 315 p. 35; Exh. 3-314]. TFO Mynatt stated that the officers did not seize this purse because Ms. O'Brian, who was present

---

[8]     One bundle of currency in the bag in the trunk of the Mercedes has a band stating that bundle contains $1,000 [Exh. 3-415].

during the search, stated that this purse was a gift from her mother [Doc. 315 pp. 35–36]. He said this was the only purse that Ms. O'Brian made any objection to the officers seizing [*Id*. at 36].

TFO Mynatt identified a photograph of a designer watch [*Id*.; Exh. 3-334]. He said that during the search, officers looked up the value of this watch and found it to be around $20,000 or $25,000 [Doc. 315 p. 36]. He stated that the watch was on a nightstand in the master bedroom near an empty currency band for $2,000 of currency [*Id*. at 36–37; Exh. 3-336 & 3-341]. TFO Mynatt stated the officers located a loaded handgun in the bottom drawer of the nightstand [Doc. 315 p. 37; Exh. 3-341]. He agreed that the watch, the money band, and the gun were all tools of the drug trade [Doc. 315 p. 37].

TFO Mynatt testified that the officers located a Dior wallet in the master bedroom containing cash and Defendant's identification [*Id*. at 37–38; Exh. 3-353, 3-358, 3-359]. He said they did not seize this wallet because it was not valued above the $1,000 threshold [Doc. 315 p. 38]. TFO Mynatt also identified a Louis Vuitton wallet found in a nightstand [*Id*. at 38–39; Exh. 3-365 & 3-367]. He stated that the officers seized this wallet after looking up its value [Doc. 315 p. 39]. He said that this wallet also contained cash [*Id*.].

TFO Mynatt identified a Shreve & Company jewelry box containing diamond earrings [*Id*.; Exh. 3-370]. He said the Shreve & Company box was found in a nightstand drawer, which also contained a receipt and an appraisal for the earrings [Doc. 315 pp. 39–40; Exh. 3-371]. TFO Mynatt said according to the documents, the earrings were purchased for $4,000 per earring and appraised at $8,000 [Doc. 315 p. 40]. He agreed that the receipt listed Hailey O'Brian and is dated June 3, 2021 [*Id*.]. TFO Mynatt also identified a photograph of a gold necklace seized from a bathroom counter [*Id*. at 46; Exh. 3-431]. He said that although the officers attempted to research the value of jewelry before seizing it, they had difficulty determining the value of jewelry not in its original

9

packaging [Doc. 315 p. 46]. He identified a box of miscellaneous jewelry that was seized [*Id*. at 48; Exh. 3-478].

TFO Mynatt also identified a pair of Versace sunglasses, which he agreed were valued at more than $1,000 if they were listed on the seizure list [Doc. 315 p. 41; Exh. 3-381]. He testified about a photograph of a Bottega designer purse containing a Louis Vuitton wallet [Doc. 315 pp. 41–42; Exh. 3-384]. He agreed that the executing officers seized this purse based upon its value [Doc. 315 pp. 42, 44; Exh. 3-410]. He said the wallet in the purse contained cash and credit cards[9] [Doc. 315 p. 42; Exh. 3-385 & 3-386]. TFO Mynatt said the purse also contained a small Yves Saint Laurent wallet [Doc. 315 pp. 42–43; Exh. 3-386]. TFO Mynatt said the officers also seized designer purses by Dior, Gucci, Louis Vuitton, and Chanel [Doc. 315 pp. 47–48]. He identified photographs of eight additional designer purses seized by law enforcement [*Id*. at 47–48; Exh. 3-472, 3-473, 3-477, 3-479].

According to TFO Mynatt, the conspiracy in this case lasted from 2019 to 2022 [Doc. 315 p. 50]. He said Hailey O'Brian moved to California during the conspiracy [*Id*.].

On cross-examination, TFO Mynatt testified that based upon discussions with Hailey O'Brian, she moved to California in 2019 [*Id*. at 50–51]. He stated that during his twenty-seven years in law enforcement, he attended at least forty hours of training each year. He said that while his law enforcement career has been in Tennessee, he has federal jurisdiction as a task force officer [*Id*. at 51–52]. TFO Mynatt said he knows that marijuana has been "decriminalized" in California [*Id*. at 52]. He agreed that during the execution of the search warrant, he seized marijuana, which he believed to be contraband [*Id*. at 55]. TFO Mynatt said that the executing officers seized what

---

[9]     TFO Mynatt did not state the amount of cash in the Louis Vuitton wallet. The currency in the photograph is fanned out, and from the denominations showing, it appears the amount was likely in excess of $1,000 [Exh. 3-386].

they were trained to recognize as unlawful marijuana [*Id*.]. He said he could not distinguish marijuana from cannabis by looking at it and that it was not practical to test the substance on the scene [*Id*. at 55–56]. He agreed that he did not test any substance intercepted from Defendant before applying for the search warrant and that he did not know the THC content of the substance seized from Defendant's residence [*Id*. at 56].

TFO Mynatt did not recall seizing a "marijuana grower's card" from Defendant's wallet [*Id*. at 56]. He said during his investigation in this case, he checked with the Trinity County Sheriff's Office on whether Defendant was a licensed marijuana grower in California [*Id*. at 56–57]. He said the Sheriff's Office provided him with paperwork showing that Defendant had applied for a grower's license twice and was denied both times [*Id*.]. TFO Mynatt did not know if the applications were for the property that was the subject of the search warrant or if anyone else had a license to grow marijuana on Defendant's property [*Id*. at 61]. He did not know if Defendant had appealed the denial of a license [*Id*. at 60–61]. TFO Mynatt said even if Defendant was an approved commercial grower of cannabis, he still believed the substance seized from Defendant's residence was contraband [*Id*. at 61–62]. He said advertising to ship marijuana out of state and doing so was unlawful [*Id*. at 62].

Defendant introduced his identification card entitled California Patient Identification Card [Exh. 4].[10] TFO Mynatt said that the identification card states, "Limit Exemption: 99 Plants / 50 Pounds" and that it expired on August 5, 2021 [Doc. 315 pp. 58–59; Exh. 4]. TFO Mynatt said he seized over 200 pounds of marijuana from Defendant's home, but he did not know how many

---

[10]     Although defense counsel referred to this card as a "marijuana grower's card" in his questions to TFO Mynatt, the card states that it permits Defendant to use and possess "medical marijuana" due to a "medical condition, which . . . may benefit from the use of medical marijuana" [Exh. 4].

plants this equaled [Doc. 315 p. 59]. He stated that even if Defendant had a "medical marijuana card," he possessed well over the fifty-pound limit at his residence [*Id.* at 62].

TFO Mynatt stated that Defendant owned the property where the residence was located [*Id.*]. He stated that a shed on the property contained indoor growing equipment, which was not in use [*Id.* at 59, 62]. He said the officers found no live marijuana plants on the property, although he acknowledged they did not walk the entire acreage [*Id.* at 59–60]. He said he did not notice whether any of the plant substance seized from Defendant's residence had been burned or damaged by smoke [*Id.* at 59–60]. He agreed he did not closely inspect the contents of each bag but stated there were no obvious signs of damage [*Id.* at 60].

He agreed that Jordan White met Defendant in California and purchased "cannabis" from Defendant in California [*Id.* at 67]. He further agreed that in his affidavit submitted in support of the search warrant for Defendant's residence, he stated that on February 17, 2022, Jordan White told him that Defendant had a Maybach Mercedes Benz [*Id.*]. He acknowledged that Jordan White also told him that Defendant had a GMC Denali truck [*Id.* at 68]. TFO Mynatt said that local officers had observed both of those vehicles parked at Defendant's residence [*Id.*]. He agreed that he knew this information before he applied for the search warrant for Defendant's residence, yet he did not ask to seize these vehicles and they are not listed on Attachment B [*Id.* at 68–69]. TFO Mynatt also acknowledged that the two vehicles were not listed in Attachment A as locations he could search but that he searched both vehicles [*Id.* at 69].

TFO Mynatt agreed that it is common for drug dealers to purchase gold jewelry, watches, and other valuable items and that he has previously asked to search for these items in his search warrant application [*Id.*]. He said that he did not ask to seize jewelry and other valuable items when applying for the search warrant in this case [*Id.*]. TFO Mynatt said the executing officers

were searching for the instrumentalities of money laundering and they used the $1,000 limit for currency and financial instruments in Attachment B as a "bright line" for seizing times that they believed were instrumentalities of money laundering [*Id*. at 70]. He said that in drafting Attachment B, he was guided by the language typically included in the attachments in the Eastern District of California [*Id*. at 71].

According to TFO Mynatt, he asked the U.S. Attorney's Office in the Eastern District of California whether he needed seizure warrants for the two vehicles and was advised that he did not because he was seizing them as proceeds [*Id*. at 71–72]. He said, instead, he was advised to go through the FBI administrative seizure process [*Id*. at 72]. TFO Mynatt said the executing officers seized the vehicles during the search and gave "evidence" to Defendant and Ms. O'Brian that the officers were seizing the vehicles [*Id*.]. He stated that Defendant "was served with the administrative paperwork through the FBI for the seizure of those vehicles" [*Id*.]. TFO Mynatt said he did not ask the U.S. Attorney's Office about seizing jewelry and watches but, instead, seized those items using the $1,000 threshold language in the search warrant as a guide [*Id*. at 74].

TFO Mynatt said law enforcement had not identified any bank accounts for Defendant prior to the search of the residence [*Id*. at 72]. He acknowledged that during the search, they found a bank card and thereafter identified Defendant's account [*Id*. at 72–73]. He said that although law enforcement discovered a business account for a construction business, nothing in Defendant's residence indicated that he had a construction business [*Id*. at 73]. TFO Mynatt said he did not know if Defendant was leasing property to other people [*Id*.]. He said the only business apparent from the search of the residence was the distribution of marijuana [*Id*.]. TFO Mynatt stated that individuals in the business of selling marijuana cannot easily use the banking system because the sale of marijuana is still a federal crime [*Id*. at 74].

TFO Mynatt testified that besides purchasing designer purses and jewelry, Defendant laundered money by creating a construction company, purchasing additional marijuana, and having Ms. O'Brian rent a post office box in her name to receive funds for him [*Id.* at 75]. He agreed that the executing officers found packages of money in Defendant's residence that had not been opened [*Id.*].

On redirect examination, TFO Mynatt stated that Defendant's role in the conspiracy was to act as a contact between Northern California marijuana growers and customers like Jordan White [*Id.* at 76]. He said Defendant would arrange meetings at which the customers could sample products [*Id.*]. TFO Mynatt said the customers would pay Defendant, who would pick up orders from the growers and transport them to the customers [*Id.*]. He said Defendant drove large amounts of marijuana from Northern California to Jordan White in Los Angeles [*Id.* at 76–77]. TFO Mynatt stated that Defendant would also hire drivers to transport the marijuana to Knoxville, Tennessee, and to North Carolina [*Id.* at 77]. He said Defendant would also fly with loads of marijuana to other states [*Id.*]. TFO Mynatt said law enforcement intercepted and seized 700 pounds of marijuana sent to Tennessee by Defendant [*Id.*]. He said that even with a medical marijuana card or a marijuana grower's card, it is illegal to ship hundreds of pounds of marijuana to Tennessee [*Id.*]. According to TFO Mynatt, U.S. postal inspectors seized more than $20,000 over three occasions from Hailey O'Brian's post office box [*Id.* at 77–78]. He said Defendant also flew to Atlanta and then drove to Knoxville to pick up money, collecting over $100,000 from Jordan White [*Id.* at 78].

TFO Mynatt said Defendant advertised on social media outlets, such as Snapchat, Signal, and Telegram, but none of Defendant's advertisements indicated he was selling medical marijuana [*Id.* at 77]. TFO Mynatt said Defendant would advertise marijuana sales on Snapchat [*Id.* at 78–

79]. He said Defendant would require his customers to show proof of a place to which he could ship the marijuana, proof of income, and a video of the customer using marijuana to prove the customer was not a law enforcement officer [*Id*. at 79]. According to TFO Mynatt, once the customer provided this proof, Defendant would arrange the details of the sale over an encrypted application, such as Telegram or Signal [*Id*.]. TFO Mynatt said that at his residence, Defendant would package the marijuana from the growers, which was contained in turkey bags, by vacuum sealing it, and then ship it in U-Haul boxes by FedEx, UPS, the postal service, or by hired drivers [*Id*. at 80]. He said after the arrest of Jordan White, Defendant continued shipping marijuana to locations other than Knoxville, such as Florida and Kentucky [*Id*. at 80–81].

TFO Mynatt agreed that marijuana can be sold legally in California but said the industry is heavily regulated [*Id*. at 81]. He stated that Defendant's sale of marijuana to Jordan White was not legal even under California law because Jordan White was not a legal dispenser of marijuana [*Id*. at 81–82].

TFO Mynatt said he seized the Defendant's two vehicles because they were proceeds of Defendant's money laundering and because Defendant used them to transport customers and marijuana [*Id*. at 82]. He agreed that he had probable cause to administratively seize Defendant's two vehicles based upon his investigation [*Id*. at 82–83]. TFO Mynatt said he included information on Defendant's vehicles in his affidavit submitted in support of the search warrant [*Id*. at 83]. He testified that after he seized Defendant's vehicles, he contacted a "seizure specialist in Sacramento," who advised that he did not need a seizure warrant for the vehicles [*Id*.]. Instead, the specialist advised that that the vehicles could be administratively seized based upon probable cause that they were used in drug trafficking, and they were the proceeds of money laundering [*Id*.]. TFO Mynatt said after the vehicles were administratively seized, they were inventoried pursuant to FBI

policy [*Id*. at 84]. He said that the inventory policy requires that the vehicles be searched and photographed [*Id*.]. TFO Mynatt said that law enforcement seized contraband found inside the vehicles during the inventory search but left items that did not have evidentiary value [*Id*.].

TFO Mynatt stated that "promotion money laundering" is using funds from the sale of illegal drugs to purchase more drugs or tools to assist in drug dealing [*Id*.]. He said here, Defendant was paid with cash and used those funds to buy more marijuana, which he then shipped to other customers [*Id*. at 84–85]. TFO Mynatt said that during the two-years he investigated this case, he did not know of Defendant or Ms. O'Brian having any job or source of income other than distributing marijuana and money laundering [*Id*. at 85].

TFO Mynatt testified that Jordan White distributed some marijuana in Los Angeles and sent some marijuana to Knoxville [*Id*. at 86]. He agreed that legal marijuana sales in California involves growers, distributors, and dispensaries [*Id*.]. He did not know how marijuana sales were taxed or the limits on the amount of marijuana that licensed growers can grow [*Id*. at 86–87]. TFO Mynatt said he did not know the California laws and penalties relating to marijuana and was not investigating violations of California law [*Id*. at 62, 88]. He said Jordan White had two other middlemen before Defendant [*Id*. at 92]. TFO Mynatt agreed that Jordan White had three 18-wheel trucks [*Id*.]. He acknowledged that he reviewed a Snapchat message stating that Jordan White would pay the transporter $69,700 [*Id*.]. He explained that Defendant instructed Jordan White to give $69,700 to the "TP," which was the transport, revealing that Defendant negotiated for the transport of the marijuana [*Id*. at 92–93]. He agreed that for the 700 pounds of marijuana that law enforcement intercepted and seized during transport, Defendant had arranged for the drivers, but Jordan White would pay them [*Id*. at 93–94].

16

## III.    FINDINGS OF FACT

On March 16, 2022, TFO Kristopher Mynatt obtained a federal search warrant to search the residence of Defendant Abdul-Latif at 380 Leslie Lane, Weaverville, California. Attachment B to the search warrant permitted the officers to seize the "evidence, contraband, fruits, or instrumentalities of" three crimes: possession with intent to distribute controlled substances, conspiracy to distribute controlled substances, and money laundering" [Exh. 1, Attachment B]. Attachment B listed the items to be seized as, "namely:" controlled substances; materials for manufacturing and packaging controlled substances and for packaging currency; currency or financial instruments of $1,000 or more; drug trafficking records and communications including electronic communications, photographs, and video recordings; calendars; travel and location information; and digital devices [*Id.*].

TFO Mynatt and other officers executed the search warrant at Defendant's residence on March 17, 2022. Defendant and his girlfriend Codefendant Hailey O'Brian, who also lived at the residence, were present during the execution of the search warrant. In addition to seizing two hundred pounds of marijuana, over $325,500 in currency, numerous records and documents, money counting and wrapping supplies, and electronic devices including six cellular telephones, the officers seized other items not specified in the list in Attachment B, which they deemed to be the proceeds or instrumentalities of drug trafficking or money laundering. Specifically, the officers seized (1) a silver Audemars Piguet watch, (2) black Versace sunglasses inside a white Tom Ford sunglasses case, (3) a beige Bottega Veneta purse with a gold chain, (4) diamond earrings in a Shreve & Company box with receipt, (5) a gold necklace, (6) a black Louis Vuitton purse, (7) a red Christian Dior Purse, (8) a beige and brown Louis Vuitton purse, (9) a blue suede Gucci purse, (10) a black Chanel purse, (11) a tan Gucci purse with a silver chain, (12) a beige and brown

17

checkered Louis Vuitton backpack, (13) a white Chanel purse, (14) jewelry in an Oh Polly box, (15) a black Louis Vuitton backpack, (16) a black Coach backpack, and (17) three black Revelry duffle bags.[11] Officers seized most of these seventeen items as proceeds of the alleged crimes and seized other items, such as the three Revelry bags, as instrumentalities of the alleged crimes.

The executing officers seized three large Revelry duffle bags filled with vacuum-sealed bags of marijuana from the garage of the residence. Officers also seized a Bottega Veneta purse (number 3 above), which contained a Louis Vuitton wallet holding cash in an amount that likely exceeded $1,000. In determining which items to seize as proceeds, the officers conducted an internet search for the value of the item and only seized the item if it was valued at $1,000 or more. Officers did not seize a black Louis Vuitton purse located in the kitchen bar area because Ms. O'Brian stated that this purse was a gift from her mother.

Officers also administratively seized a white GMC Denali truck and a silver and navy two-tone Maybach Mercedes Benz. According to the search warrant affidavit, Defendant used the truck to transport marijuana to Jordan White and used the Maybach to transport customers to sample marijuana and to travel to meet White. TFO Mynatt said the officers conducted inventory searches of both vehicles pursuant to FBI policy, which requires that all seized vehicles be inventoried and photographed. Officers seized a black Louis Vuitton backpack (number 15 above) containing $2,200 from the backseat of the truck and a black Coach backpack (number 16 above) containing $6,786 from the trunk of the Maybach.

---

[11]     This list of items is taken from the Receipt for Property attached to the search warrant return [Exh. 2] and constitutes the items, along with the Maybach Mercedez Benz and the GMC Denali truck, which are challenged by Defendant. These numbered items, along with the Maybach and Denali, are listed in the forfeiture allegations of the Indictment [Doc. 3 pp. 5–6] and the Superseding Indictment [Doc. 146 pp. 6–7].

The officers left a receipt for all property with Defendant and Ms. O'Brian, who were not arrested at the conclusion of the search. The FBI subsequently served Defendant with the administrative forfeiture paperwork for the two vehicles seized from his residence.

## IV. ANALYSIS

The Fourth Amendment requires that a search warrant describe with particularity the place to be searched and the items to be seized. U.S. Const. amend IV. "The particularity requirement forecloses the opportunity for a general search and 'prevents the seizure of one thing under a warrant describing another,' by restricting the discretion of the executing officer." *United States v. Hanson*, Nos. 3:18-CR-61-HBG & 3:18-PO-53-HBG, 2018 WL 4223320, at * 9 (E.D. Tenn. Sept. 5, 2018) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). The execution of a search warrant, like its issuance, must be reasonable. *Brown v. Battle Creek Police Dept.*, 844 F.3d 556, 567 (6th Cir. 2016) (citation omitted).

Defendant Abdul-Latif argues that officers violated his rights under the Fourth Amendment when they seized nineteen items outside the scope of the search warrant for his residence. He asks the Court to suppress all items seized from his residence during the execution of the search warrant because the executing officers acted in flagrant disregard for the terms of the warrant. Alternatively, he asks that the Court suppress the nineteen items wrongfully seized. Finally, Defendant contends that all suppressed evidence must be returned to him.

For the reasons set forth below, the undersigned finds that the officers properly seized six of the nineteen items challenged by Defendant. The two vehicles were properly seized either as instrumentalities of the alleged crimes or pursuant to an administrative seizure. The beige Bottega Veneta purse, the three Revelry duffle bags, the black Louis Vuitton backpack, and the black Coach backpack were properly seized as instrumentalities or evidence of the alleged crimes or

19

under the plain view exception to the warrant requirement. The remaining thirteen items (the watch, sunglasses, jewelry, seven handbags, and one backpack), however, fall outside the scope of the search warrant and should be excluded from the evidence presented at trial. But these thirteen items may not be returned to Defendant at this stage in the proceedings because they are subject to forfeiture.

### A.    Propriety of Seizure

Particularity in items to be seized follows no set formula. Instead, the warrant must provide sufficient "information to guide and control the executing agent's judgment in selecting what to take." *United States v. Chaney*, 921 F.3d 572, 585 (6th Cir. 2019) (citation omitted & cleaned up). Thus, a search warrant's particularization of the items to be seized need only be "as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Banks*, 684 F. App'x 531, 536 (6th Cir. 2017) (quoting *United States v. Ables*, 167 F.3d 1021, 1033 (6th Cir. 1999)). "The degree of specificity required in a search warrant varies depending on (1) 'what information is reasonably available to the police,' (2) 'the crime involved,' as well as (3) 'the types of items sought.'" *United States v. Raglin*, 663 F. App'x 409, 412 (6th Cir. 2016) (citations omitted). "A warrant that empowers police to search for something satisfies the particularity to requirement if its text constrains the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2918) (citations omitted). "[S]pecification of the underlying offense is the key limit on the scope of the search, not a speculative or boilerplate list." *Raglin*, 663 F. App'x at 413 (citing *Wheeler v. City of Lansing*, 660 F.3d 931, 939 (6th Cir. 2011)).

### 1.  Attachment B

Defendant argues that the list of items in Attachment B was specific and exhaustive and did not authorize the seizure of any vehicles, watches, jewelry, purses, or other personal property

20

not specifically listed [Doc. 129 p. 1]. He contends that officers exceeded the scope of the search warrant when they seized the two vehicles and seventeen items of valuable property because these items do not come within any of the enumerated categories of items in Attachment B [*Id*. at 1–2]. The Government maintains the officers were not limited to the categories of items listed in Attachment B but could also seize items that qualified as instrumentalities or fruits of the listed crimes [Doc. 252 pp. 5–6].

If an item "constitutes evidence of the commission of a criminal offense and was an instrumentality of a crime, it can be seized although not specifically listed in the search warrant." *Wheeler*, 660 F.3d at 939 (quoting *United States v. Korman*, 614 F.2d 541, 547 (6th Cir.1980) (citation omitted & cleaned up)) ("[I]t was reasonable for [the executing officer] to believe that, as long as the search warrant established probable cause for the search, which it clearly did, he could seize any items he encountered that constituted evidence of the commission of the home invasions, which stolen property clearly does."). In one case, a green ski jacket, worn by the defendant when picking up a shipment of drugs, was described in the affidavit but omitted from the items particularized in the search warrant. *Korman*, 614 F.2d at 542. The court determined law enforcement properly seized the jacket as "evidence of the commission of a criminal offense and . . . an instrumentality of a crime . . . although not specifically listed in the search warrant." *Id*. at 547 (citation omitted); *see also United States v. Green*, No. 1:09–CR–87, 2010 WL 3398141, at *5–6 (E.D. Tenn. Aug. 26, 2010) (determining seizure of currency, firearms, and ammunition was not outside the scope of a warrant permitting the seizure of controlled substances because the unlisted items were evidence and instrumentalities reasonably related to drug trafficking alleged in the search warrant).

Here, the two vehicles and the Bottega Veneta purse, the Revelry bags, the black Louis Vuitton backpack, and the Coach backpack were all properly seized as instrumentalities of the crime of drug trafficking. TFO Mynatt testified that his investigation revealed that the vehicles were used to transport marijuana and customers. Also, large amounts of currency were found in both vehicles and ten turkey bags of marijuana were seized from the truck. The purse and both backpacks held large amounts of currency, and the Revelry bags were filled with vacuum-sealed bags of marijuana. Thus, the officers properly seized these items as instrumentalities of the charged offenses, even though they did not fall within the specific categories enumerated in Attachment B.

The undersigned views the remaining thirteen items at issue, which were seized as the fruits or proceeds of money laundering, differently. Unlike the Bottega Veneta purse, backpacks, and luggage, these items were not implicated as containers of contraband or large amounts of currency. Moreover, the only proceeds described in the affidavit are currency, and even if the affidavit included designer bags and jewelry, the affidavit is not incorporated in the search warrant. *See Green*, 2010 WL 3398141, at *5 (observing that ambiguity in the search warrant can be "cured by the affidavit" that is incorporated by reference in the warrant); *see also United States v. Blakeney*, 942 F.2d 1001, 1024 (6th Cir. 1991) ("A search warrant may be construed with reference to a supporting affidavit if the affidavit accompanies the warrant and the warrant incorporates the affidavit by reference." (citation omitted)). The location searched was Defendant's residence, "where one might expect a person to keep his possessions, ill-gotten or not," and the warrant provided no basis to "distinguish[] between valuable items that were drug proceeds and those that were not."[12] *United States v. Popham*, 382 F. Supp. 2d 942, 955 (S.D. Mich. Aug. 15, 2005)

---

[12] The fact that the officers applied the $1,000 limit for currency to other items seized as proceeds is discussed in the next section on the exclusionary rule and the good-faith exception.

(rejecting search warrant to seize "all U.S. currency, gold, jewelry, stocks, bonds, certificates of deposit and items of value being proceeds of or used to facilitate trafficking controlled substances" as overly broad). The watch, sunglasses, jewelry, seven other designer purses, and the brown and beige checkered Louis Vuitton backpack were seized outside the scope of the search warrant.

### 2. Administrative Forfeiture

The Government contends the executing officers had probable cause to believe the vehicles were used in drug trafficking and, thus, could lawfully seize them under asset forfeiture and inventory their contents [Doc. 262 p. 4]. An officer can seize an automobile from a public place without a warrant when the officer has "probable cause to believe the vehicle is forfeitable contraband." *United States v. Musick*, 291 F. App'x 706, 722 (6th Cir. 2008) (citing *Florida v. White*, 526 U.S. 559, 566 (1999)). Here, the officers had probable cause to believe both vehicles were used in the marijuana trafficking conspiracy. *See United States v. Vance*, Nos. 20-5819/5820, 2021 WL 5133250, at *5 (6th Cir. Nov. 4, 2021) (determining that officers could seize a truck, which they believed to be stolen, without a warrant because it was contraband), *cert. denied*, 142 S. Ct. 1693 (2022). Although the vehicles were seized from Defendant's driveway, rather than a public place, the officers were validly on the premises executing a search warrant.

Once the officers seized the vehicles for forfeiture, the officers could properly conduct an inventory search of the vehicles. *Musick*, 291 F. App'x at 721 ("[P]re-forfeiture inventories do not require warrants." (citation omitted)); *United States v. Decker*, 19 F.3d 287, 290 (6th Cir. 1994) (distinguishing between an inventory search of a forfeitable vehicle and "a regular inventory search" and holding that "once a vehicle is validly seized for forfeiture, it can be searched *at will*, without a warrant." (citation omitted)). "An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle,

23

they may conduct an inventory search to catalogue its contents pursuant to standardized criteria."
*United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)). An officer impounding and inventorying a vehicle "do[es] not enjoy [his or her] accustomed discretion" but, instead, must follow standard procedures, rather than acting for investigatory purposes. *Id*. at 915–16 (citation omitted).

TFO Mynatt testified that the officers conducted an inventory search of both vehicles pursuant to FBI policy, which requires that all vehicles seized for forfeiture be inventoried and photographed. The Government argues that nothing the record indicates that the officers failed to follow their standard operating procedures in inventorying the vehicles [Doc. 262 pp. 4–5]. To the extent that these requirements apply to an inventory search of a vehicle seized for forfeiture, the undersigned finds that once the officers seized the Denali and Maybach, the officers had no discretion in determining whether to conduct an inventory search of the vehicles.

### 3. Plain view

Officers may lawfully seize evidence and contraband in "plain view" without a warrant. *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (citing *Minnesota v. Dickerson*, 508 U.S. 375 (1993)). "Under the plain view doctrine, four factors must be satisfied: '(1) the item seized must be in plain view, (2) the item's incriminating character must be immediately apparent, (3) the officer must lawfully be in the place from where the item can be plainly seen, and (4) the officer must have a lawful right of access to the item.'" *United States v. Loines*, 56 F.4th 1099, 1106 (6th Cir. 2023) (quoting *United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013).

Here, these four factors are met as to the Bottega Veneta purse, the three Revelry bags, the black Louis Vuitton backpack seized from the backseat of the trunk and the black Coach backpack seized from the trunk of the Maybach. The Bottega Veneta purse and Revelry bags were searched

24

during the execution of the search warrant for Defendant's residence. Because officers were searching for currency and controlled substances, they could lawfully search in any container that could reasonably contain those items. *United States v. Lengen*, 245 F. App'x 426, 434 (6th Cir. 2007) ("[J]udicial authorization to search a home for contraband drugs, money associated with drug trafficking, and drug paraphernalia would clearly justify the opening of doors, closets, drawers, safes, and other places where the listed items could be hidden." (citing *United States v. Ross*, 456 U.S. 798, 820 (1982))). The officers properly searched the two backpacks during the inventory search of the vehicles. Once the officers saw the large quantities of currency or marijuana inside the purse, backpacks, and bags, the incriminating character of these containers as instrumentalities was immediately apparent. Accordingly, the undersigned finds the Bottega Veneta purse, the three Revelry bags, the black Louis Vuitton backpack, and the black Coach backpack were also properly seized under the plain view doctrine.

In sum, the undersigned finds that the officers properly seized both vehicles, the Bottega Veneta purse, the three Revelry bags, the black Louis Vuitton backpack, and the black Coach backpack. The remaining thirteen items—the watch, sunglasses, jewelry (diamond earrings, a gold chain, and a collection of jewelry in an Oh Polly box), seven designer purses, and one beige and brown checkered Louis Vuitton backpack—were seized outside the scope of the search warrant.

## B. Exclusion and the Good-Faith Exception

Items seized outside the scope of a search warrant must be suppressed. *United States v. Garcia*, 496 F.3d 495, 507 (6th Cir. 2007) (noting that when officers exceed the scope of the warrant in the items seized, rather than the places searched, only the unlawfully seized items must be suppressed). Defendant argues that that due to the officers' flagrant disregard for the terms of the warrant, the Court should suppress all items seized in its execution [Doc. 129 p. 3; Doc. 241

p. 4]. The Government argues that the good-faith exception applies to save any improperly seized items because the officers acted reasonably in seizing fruits of the charged offenses that were valued at $1,000 or more [Doc. 262 p. 1]. For the reasons that follow, the undersigned finds that only the thirteen items improperly seized must be suppressed.

At the motion hearing, Defendant argued that all evidence seized during the execution of the search warrant for his residence must be suppressed because the officers acted in flagrant disregard for the terms of the warrant. As evidence of their flagrant disregard, he asserted that a third of the items listed on the receipt for the search warrant return were seized outside the scope of the search warrant. Moreover, he contends that the officers' actions in conducting internet searches to determine the value of items they knew fell outside the warrant's scope further illustrates the flagrancy of their disregard for the warrant, which provided that threshold amount only for currency and financial instruments. Thus, Defendant maintains that suppression of all the evidence is the appropriate remedy.

Defendant's argument for suppression of all items seized is at odds with the case law in the Sixth Circuit, which provides such sweeping relief only when the execution exceeds the warrant in the location searched, not in items seized. *Garcia*, 496 F.3d at 507. While recognizing that "blanket" suppression of all items seized may be appropriate when an officer acts in flagrant disregard for the terms of a search warrant, "[a]n executing officer is said to flagrantly disregard the limitations of a warrant when he "exceed[s] the scope of the warrant in the places searched." *United States v. Ambrose*, No. 2:08–CR–39, 2009 WL 890055, at *12 (E.D. Tenn. Mar. 30, 2009) (citing *Waller v. Georgia*, 467 U.S. 39, 43 n.3 (1984)) (alteration in original). By searching a place not authorized by the warrant, the officer violates the homeowner's privacy, whereas seizing items outside the scope of the warrant only deprives the homeowner of control over that property.

26

*Garcia*, 496 F.3d at 507. Thus, "where the officers unlawfully seize certain items but do not flagrantly disregard the limits of the warrant by unreasonably searching places not authorized in the warrant, the court must suppress the unlawfully seized items, but" need not suppress lawfully seized items as well. *Id*. Here, the executing officers did not search locations that the warrant did not authorize.[13]

Even if blanket suppression were a remedy for seizure of items not listed in the search warrant, the undersigned does not find the officers' conduct in seizing thirteen items outside the scope of the warrant to be the type of "extreme" conduct that warrants blanket suppression. *See Ambrose*, 2009 WL 890055, at *12 ("[A] blanket or general exclusion of all evidence seized pursuant to an otherwise valid warrant is an extraordinary remedy that should be imposed only when the officer's violations were 'extreme.'"); *see also United States v. Torres*, No. 21-6102, 2022 WL 13983627, at *3–4 (6th Cir. Oct. 24, 2022) ("[B]lanket suppression is warranted only where the officer flagrantly and unreasonably exceeds the scope of the warrant" and "has typically been reserved for 'exceptionally egregious circumstances[.]'" (citation omitted)). Instead, the officers applied the $1,000 threshold for currency to items they believed constituted fruits of criminal activity. As noted by the Government, the officers did not seize all items of value in the residence. For example, they did not seize a Louis Vuitton purse that Ms. O'Brian said was a gift

---

[13]     On cross-examination, TFO Mynatt agreed that the search warrant did not authorize the search of Defendant's vehicles in Attachment A, although he knew Defendant owned the vehicles prior to applying for the search warrant [Doc. 315 p. 68–69]. "If the search of places not authorized by a warrant satisfies an exception to the warrant requirement, however, there is no violation and no basis for blanket suppression." *United States v. Beals*, 698 F.3d 248, 267 (6th Cir. 2012). Here, the officers properly conducted an inventory search of the vehicles which were seized as forfeitable contraband because they were used in the commission of drug trafficking. Thus, the officers did not violate the warrant by searching unauthorized places.

27

from her mother. Accordingly, Defendant's call for blanket suppression is unfounded under the circumstances of this case.

The Government argues that the Court should apply the good-faith exception to the execution of the search warrant for Defendant's residence and find that the exclusionary rule does not apply because the officers acted reasonably and in good faith. [Doc. 262 p. 1]. The purpose of excluding evidence gained in violation of the Fourth Amendment is to deter law enforcement from engaging in future Fourth Amendment violations. *United States v. Calandra*, 414 U.S. 338, 347–48 (1974) (observing that the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect"). The exclusionary rule should not be applied "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920 (1984). If the officer's reliance on the search warrant was "objectively reasonable," then the suppression of evidence seized pursuant to a faulty warrant has no deterrent effect on the officer. *Id.* at 922.

But the good-faith exception does not apply when, as here, "it is the officers' conduct in exceeding the scope of the search warrant, rather than any defect in the search warrant itself, that is the basis for suppression." *United States v. Torres*, No. 3:19-CR-125-TAV-HBG, 2020 WL 5200951, *14 (E.D. Tenn. June 8, 2020) (declining to apply the *Leon* good-faith exception to officers' search of travel trailer outside the defendant's property line), *report & recommendation adopted by* 2020 WL 6694304 (E.D. Tenn. Nov. 13, 2020), *aff'd*, 2022 WL 13983627 (not addressing good-faith analysis). The good-faith exception applies when it is the issuing judge, rather than the officer, who erred. *United States v. Davis*, No. 22-3603, 2023 WL 6967567, at *4, 6 (6th Cir. Oct. 23, 2023) (declining to exclude evidence

when judge failed to record affiant's sworn testimony and include it in affidavit). This is because "'[p]enalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" *United States v. White*, 874 F.3d 490, 505–06 (6th Cir. 2017) (quoting *Leon*, 468 U.S. at 921). "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). For the exclusionary rule to apply, law enforcement's action must be "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at *13 (citation omitted).

Here, TFO Mynatt and the executing officers knew the items seized did not fall within one of the categories listed in Attachment B. Instead of seeking another search warrant for valuable items deemed to be proceeds, the officers applied the $1,000 threshold from the restriction on currency.[14] The undersigned finds that the officers' actions were deliberate and that the exclusionary rule should apply to suppress the thirteen items seized outside the scope of the search warrant.

### C.  Return of Forfeitable Items

Relying on Federal Rule of Criminal Procedure 41(g), Defendant argues that he is entitled to return of the items improperly seized [Doc. 241 p. 1–2]. He contends that the Government should not be permitted to benefit from the wrongdoing of its agents in circumventing the limitations of a search warrant [*Id.* at 2]. He maintains that Rule 41 is broader than and trumps the

---

[14]     During the execution of the search warrant, the officers called for guidance from the United States Attorney's office about whether the two vehicles were forfeitable, but there is no testimony that the officers similarly sought guidance with regard to the designer bags and jewelry.

judicially created exclusionary rule [*Id.*]. The Government contends that Rule 41(g) does not apply in this case because the property is the subject of forfeiture allegations [Doc. 252 p. 8].

Federal Rule of Criminal Procedure 41(g) provides that a "person aggrieved by an unlawful search and seizure of property . . . may move for the property's return."[15] "The general rule is that seized property, other than contraband, should be returned to the rightful owner after the criminal proceedings have terminated." *United States v. Ford*, No. 15-023, 2017 WL 6564065, at *1 (W.D. Ky. Dec. 21, 2017) (quoting *Sovereign News Co. v. United States*, 690 F.2d 569, 577 (6th Cir. 1982)). It, however, is subject to two caveats, (1) the individual seeking the property's return must show a lawful right to it and (2) the property need not be returned when the government has a continuing interest in it. *Habich v. Wayne Cnty.*, No. 20-12528, 2022 WL 1569277, at *9 (E.D. Mich. May 18, 2022) (finding no right to return of vehicle when criminal prosecution is ongoing), *aff'd*, No. 22-1517, 2023 WL 2911663 (6th Cir. Apr. 12, 2023). "[W]hen considering a motion to return, the court must balance the legitimate needs of the United States against the property rights of the moving party." *Popham*, 382 F. Supp. 2d at 956.

The government has a continuing interest in property that is subject to forfeiture. *United States v. Vaccaro*, 602 F. Supp. 3d 1027, 1030 (N.D. Ohio May 12, 2022); *United States v. Hills*, No. 1:16CR329, 2018 WL 1621088, at *8 (N.D. Ohio Apr. 4, 2018) (holding defendant was not entitled to return of funds that are named in the indictment's forfeiture allegations but must wait to "contest[] forfeiture at the conclusion of the criminal proceedings" (citation omitted)); *see also United States v. One 1974 Learjet 24D*, 191 F.3d 668, 673 (6th Cir. 1999) ("After the government

---

[15]     A motion for the return of property must be filed in the district where the property was seized, Fed. R. Crim. P. 41(g), but a motion to suppress evidence may be filed in the court where the trial will occur, Fed. R. Crim. P. 41(h). In oral argument, Defendant asserted that he moves for the return of property in this district because although seized in California, the property has been transferred to and is held in this district.

initiates forfeiture proceedings and notifies a claimant of the proceedings, a claimant may no longer use Rule 41([g) to gain the return of the property], but instead must submit to the statutory procedures governing civil forfeiture proceedings." (citation omitted)). Here, the Government has a continuing interest in the property because the thirteen items are part of the forfeiture allegations in the Superseding Indictment. Moreover, Defendant has failed to show a lawful interest in some of the items, such as the diamond earrings, which had a receipt to Hailey O'Brian, and the designer purses.[16] After weighing the parties' interests in the property, the undersigned finds that the thirteen items should not be returned at this time.

## V.    CONCLUSION

For the reasons discussed herein, the undersigned finds that law enforcement properly seized a Maybach Mercedes Benz, a GMC Denali truck, a beige Bottega Veneta purse with a gold chain, three Revelry bags, a black Louis Vuitton backpack, and a black Coach backpack. But the following thirteen items were seized outside the scope of the search warrant and should be suppressed: a silver Audemars Piguet watch, black Versace sunglasses inside a white Tom Ford sunglasses case, diamond earrings in a Shreve & Company box, a gold necklace, a black Louis Vuitton purse, a red Christian Dior Purse, a beige and brown Louis Vuitton purse, a blue suede Gucci purse, a black Chanel purse, a tan Gucci purse with a silver chain, a beige and brown checkered Louis Vuitton backpack, a white Chanel purse, and jewelry in an Oh Polly box. These thirteen items, however, should not be returned to Defendant at this time.

---

[16]    On October 26, 2023, the Government and Defendant Hailey O'Brian filed an Agreed Preliminary Order of Forfeiture, in which Defendant O'Brian forfeited all interest in the nineteen items challenged by Defendant [Doc. 350 p. 2]. The Agreed Preliminary Order provides that "[t]he aforementioned forfeited properties are to be held by the United States Marshals Service, or its representative, until the investigation [of the ownership of the properties] is complete" [*Id*. at 3].

31

The undersigned therefore **RECOMMENDS** that the District Judge **GRANT** Defendant Abdul-Latif's Walker's Motion to Suppress Evidence and Return Items Seized Outside the Scope of Search Warrant [**Doc. 129**] **in part**, in that thirteen items seized from the residence be suppressed and excluded from the evidence at trial, and **DENY** Defendant's motion in all other respects.[17]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[17] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).

32